[600 NYS2d 682]

In the Matter of DONNA KELLY et al., on Behalf of Themselves and All Others Similarly Situated, Respondents, and ANDREA McSWAIN et al., on Behalf of Themselves and All Others Similarly Situated, Intervenors-Respondents, v MARY JO BANE, as Commissioner of the New York State Department of Social Services, Appellant, et al., Defendants.

First Department, July 22, 1993

APPEARANCES OF COUNSEL

*Judy E. Nathan* of counsel *(Robert Abrams, Attorney-General,* attorney), for appellant.

*Richard E. Blum* of counsel *(Jane Booth, Jean T. Schneider, Susan C. Bahn* and *Marcella Silverman* with him on the brief; attorneys), for respondents and intervenors-respondents.

## OPINION OF THE COURT

ELLERIN, J.

Plaintiffs-respondents and plaintiffs-intervenors-respondents are low-income families and individuals facing eviction and homelessness as a result of rent arrears. Plaintiffs commenced this combined declaratory judgment and CPLR article 78 proceeding against the Commissioner of the New York State Department of Social Services (DSS) seeking, *inter alia,* a declaration that an amendment to the regulations governing the "Emergency Home Relief" (EHR) program (18 NYCRR 370.3 [b] [2]), which disqualified households with gross income in excess of 125% of the Federal poverty guidelines from eligibility for assistance, is invalid as arbitrary and capricious, unconstitutional and illegally promulgated as an emergency

regulation in violation of applicable State Administrative Procedure Act requirements. Plaintiffs and the plaintiffs-intervenors also moved for an order vacating those administrative decisions of DSS which denied their applications pursuant to the amendment and remanding these cases for further evaluation of eligibility, and providing for class certification for themselves and all others similarly affected by the challenged amendment.

The EHR program (18 NYCRR 370.3), which was created under the rule-making power of the DSS, is a last resort for certain New York State residents with emergency needs who are ineligible for assistance under other State or Federal programs. Under EHR, one-time emergency assistance payments are available to people facing, *inter alia*, eviction for nonpayment of rent.

Prior to July 19, 1991, the regulation regarding Emergency Home Relief eligibility provided:

"(b) *Eligibility for emergency home relief.* Social services districts must authorize emergency home relief only under the following conditions:

"(1) there is an identified emergency need. An emergency is a serious occurrence or situation needing prompt action;

"(2) the individual or family is without income or resources immediately available to meet the emergency need;

"(3) the emergency need cannot be met under the Emergency Assistance to Needy Families with Children, the Home Energy Assistance Program, Aid to Families with Dependent Children or Home Relief programs; and

"(4) the emergency did not arise because the applicant failed to comply with the requirements of Part 385 of this Title relating to employment and training and was disqualified from receiving assistance pursuant to section 385.14 (e) of this Title" (18 NYCRR 370.3 [b]).

In response to a legislative mandate to reduce special needs allowances (L 1991, ch 53 [Aid to Localities Act]), the Commissioner amended paragraph (2) of the the above regulation by emergency regulation to provide: "(2) the individual or family is without income or resources immediately available to meet the emergency need; *and the individual's or family's gross income does not exceed 125 percent of the current federal income official poverty line (as defined and annually revised by the federal office of management and budget). If the emergency is the result of a fire, flood or other like catastrophe or if the*

*emergency assistance is granted in accordance with subdivisions 352.5 (c), (d) and (e) of this Part, the individual's or family's gross income can exceed 125 percent of the federal income official poverty line"* (13 NY Reg [issue 32] 33 [Aug. 7, 1991] [emphasis in original denotes language added by amendment]).

At the same time, the Commissioner added a new paragraph (5) requiring that an applicant for emergency shelter arrears payments reasonably demonstrate an ability to pay ongoing shelter expenses providing that shelter arrears need not be paid to maintain a specific housing accommodation when the local social services official determines that the household has sufficient income or resources to secure and maintain alternate permanent housing. On December 24, 1991, following a period for public notice and comment, the Commissioner adopted the regulatory amendments on a permanent basis.

Subsequently, on or about April 2, 1992, the State Legislature enacted, for the first time, specific limitations for the granting of Emergency Home Relief to pay rent, mortgage arrears or real property taxes to those "whose gross household income does not exceed one hundred twenty-five percent of the federal income official poverty line and who sign a repayment agreement agreeing to repay the assistance in a period not to exceed twelve months." (Social Services Law § 131-w.) The legality of neither this statute nor the permanent regulations was before the Supreme Court in this action, which exclusively involved applications for EHR denied pursuant to the emergency regulation.

All of those applications were denied pursuant to an interpretation of the amended regulation by DSS which requires an applicant to establish that his or her prospective income as of the time of the application for EHR is below the requisite 125% threshold mentioned in the regulation. According to DSS policy, gross income for purposes of eligibility is determined by computing the income of the applicant for the eight weeks preceding the application, while taking into account any changes which have occurred during those weeks which are likely to remain permanent, such as a raise in salary.

Among the persons whose applications were denied under the new regulations is plaintiff Jannett Doyley, a single working mother who lives with her six-year-old son in a one-bedroom rent-stabilized apartment for which she pays rent of

$493.31 per month. After her husband abandoned her, Ms. Doyley received public assistance for several years until, in early 1991, she began working part time as a home attendant and stopped receiving public assistance. In June 1991, she was sued for nonpayment of rent, which was a result of her having been out of work for several weeks in March. In July, a final judgment was entered against her for rent arrears from May through July 1991. In October 1991, Ms. Doyley applied for EHR to pay her rent arrears, but her application was denied. After obtaining a stay of eviction, Ms. Doyley sought review by DSS in a "Fair Hearing." The Administrative Law Judge found her ineligible for EHR because her gross income, which was apparently computed as of the time of the hearing, by which time she was working at two jobs, exceeded 125% of the Federal poverty level for a household of two.

Although Ms. Doyley believes that, as she is now employed in two jobs, she can pay current and future rent, she is unable to pay her rent arrears, which total $2,959.86 and which were accrued when she was out of work and after a period during which she had only been employed part time and had recently come off the public assistance rolls. She also states that she has looked unsuccessfully for an alternate adequate, safe, and affordable one-bedroom apartment for her son and herself. She alleges that if the rent arrears on her current apartment are not paid, she and her son will become homeless, and as a result she may lose her jobs and again require public assistance.

Proposed intervenor Eric Hannibal is a 64-year-old single man living at the Harlem YMCA who has never received recurring grants of public assistance. Due to a series of layoffs in 1990, Mr. Hannibal fell behind in his rent of $84 per week. As a result, Mr. Hannibal was evicted in August 1991 resulting in his living on the subway. He was subsequently restored to his residence at the YMCA upon entering into a stipulation allowing him to remain there and pay use and occupancy pending the outcome of his efforts to obtain an EHR grant to cover arrears. If successful, he will be permanently restored to possession.

Mr. Hannibal applied for EHR in September 1991 alleging that his then-current income from two courier jobs was sufficient to meet his current expenses but that he was unable to pay his arrears. His application was denied, and upon appeal, that denial was upheld based on the finding by the ALJ that Mr. Hannibal's annualized income, as of the time he applied for

EHR and held two jobs, exceeded, by $4.90 per month, the requisite figure of $690 per month.

Plaintiff-intervenor Andrea McSwain is a 34-year-old single parent who lives with her 12-year-old twins, one of whom is asthmatic, in a $314-per-month New York City Housing Authority apartment. After eight years as a construction worker, Ms. McSwain was laid off in February 1991 because of lack of work. She received unemployment insurance benefits from March to September 1991 amounting to approximately one half of her prior earnings. After her benefits ran out, she was without any income for several weeks, until late September 1991, when she obtained a position in a plumbing apprenticeship program where she earns $290 per week.

While she was unemployed, Ms. McSwain fell behind in her rent, and, in the fall of 1991, her landlord commenced a summary nonpayment proceeding. Ms. McSwain applied in October 1991 for EHR. Her application was denied and, after a "Fair Hearing," the denial was upheld because her monthly family income from the time of application to the time of the hearing was $1,258.83 per month, exceeding the cutoff figure of $1,160 for a family of three.

Ms. McSwain is now capable of paying her ongoing rent, but lacks the funds to pay the arrears of $942. In view of the long waiting list for subsidized housing in New York City, she has no expectation of obtaining affordable living accommodations if she loses her apartment, and fears that she and her family will become homeless. It is also important that Ms. McSwain remain in the immediate neighborhood to care for her disabled brother.

The facts of these and other similar cases make a compelling argument supporting plaintiffs' contention that the application of the regulation's bright-line income test to their EHR applications was arbitrary and irrational. The IAS Court, in agreeing with such conclusion, found that the severe limitation of the EHR program to those whose gross income falls below 125% of the Federal poverty line, no matter when their income is measured, will undoubtedly result in the failure to help some deserving people avoid homelessness and will ultimately result in a much higher cost to the State.

While there is undoubtedly merit to the argument that the inflexible imposition of such a limited income ceiling unfortunately vitiates many of the valuable aspects of this commendable program which seeks to stem the tide of homelessness, it

cannot be said that the amended regulation is, in and of itself, irrational. This conclusion is supported by the fact that the agency was directed to reduce spending on programs such as EHR and by the subsequent enactment of legislation imposing precisely the same restriction. Of course, it could be persuasively argued that an amendment which, as a condition precedent to one-time assistance with rent arrears, imposes a bright-line test of income below 125% of the Federal poverty line, an amount that supports a standard of living barely above the subsistence level, will necessarily result in innumerable evictions leading to increased homelessness with its devastating social consequences, both personal and communal, as well as to increased calls upon public assistance funds. To speak of securing "alternate permanent housing", as does the regulation (18 NYCRR 370.3 [b] [5]), is to ignore the harsh realities of the current urban housing market. The consequence of adding substantial numbers of low-income individuals and families to the homeless rolls, a readily foreseeable result of the 125% bright-line test, is directly in conflict with both the underlying purpose of the regulation to prevent homelessness and the amendment's cost containment goal. Nevertheless, while it may appear that the amendment is, in the long run, unwise, it cannot be said that, on its face, the amended regulation, "reflecting the choice made by the department * * * is 'so lacking in reason for its promulgation that it is essentially arbitrary' " *(Matter of Bernstein v Toia,* 43 NY2d 437, 448, quoting *Matter of Marburg v Cole,* 286 NY 202, 212). However, while the regulation, as written, is not in itself arbitrary or irrational, we find that DSS's interpretation of the amendment, by which it applies the income test for eligibility to prospective income only, rather than to income prior to and during the emergency which led to the arrears, has created a result which is so irrational as to warrant permissible judicial intervention.

It is clear that, regardless of the validity of a regulation as written, and taking into account that an administrative agency's interpretation of its own regulation must be afforded great weight, the courts must intervene when there is a showing that such an interpretation is irrational, arbitrary and capricious *(see, Matter of Johnson v Joy,* 48 NY2d 689; *Matter of Rosenkrantz v McMickens,* 131 AD2d 389). In this case, what renders the interpretation given by DSS to the amendment irrational, rather than merely harsh, is the fact that, by applying the 125% income limit to prospective income

as of the time of application, DSS undermines its own stated goals. The explanation by DSS in justification for the 125% rule is as follows: "[F]amilies or individuals with incomes above [125 percent of the federal poverty level] should be able to plan for emergencies. * * * DSS determined that a family whose income is over 125 percent of the poverty level should have been able to plan their budget in the first instance to avoid the emergency at all. Thus, [the Amendment] attempts to limit assistance to those who should have been able to pay their rent, but used their income for other things. * * * DSS determined that setting the income restriction at the poverty level did not provide a sufficient safety net, but that once income reached 125 percent of the poverty level, families would have sufficient income to plan for emergencies. * * * DSS made the considered determination that when a family or individual's income exceeds 125 percent of the poverty level, it could either locate new accommodations or plan sufficiently to meet emergencies, and thereby avoid having rent arrears that could not be paid."

Despite this clearly stated rationale, the agency in its application of the rule considers income only as of the time of the application rather than as of the time of the emergency itself and a reasonable period preceding the emergency, which is the only time during which "planning" could have taken place or the arrears could have been avoided. In focusing on projected income only, DSS is undermining and frustrating the very purpose which, by its own acknowledgement, underlies the regulation, and its interpretation must, therefore, be said to be irrational.

The irrationality of such construction is pointed up by the case histories previously detailed which are representative of many of those seeking relief under the regulation for one-time payment of rent arrears. In the case of Jannett Doyley, for example, we have a mother, with a six-year-old son, who was forced onto public assistance for several years after her husband left her. During her initial struggles to enter the work force on a steady basis and during a period of unemployment she accumulated rent arrears on her $493 a month apartment. After overcoming various hardships and working at two jobs, she managed to achieve a modicum of economic independence. Now that she is no longer a burden on the community's limited economic resources, she is to be punished because by working 55 hours a week she has succeeded "too well" and, as a consequence, by looking only at her current

slightly above 125% of the poverty line income, she is deemed ineligible for a one-time allowance for past rent arrears which accumulated while she was unemployed. As a result, she and her son will face eviction and homelessness which may well again force them to seek public assistance and other costly social welfare services. Such a result is hardly in furtherance of the amendment's "cost containment" goal.

Significantly, the regulation itself is completely silent as to the dates during which gross income is to be computed. On this appeal, DSS has offered no rational explanation for its decision to compute income prospectively as of the time of the application for past rent. While such a prospective method would be appropriate to determine eligibility for ongoing future social services or monthly payments of public assistance, there is no reasonable basis for using that method for determining eligibility for the very different type of emergency lump-sum assistance contemplated by the Emergency Home Relief program, which is designed to redress past emergencies which are already over, in distinction to ongoing financial need. There is no support in the record or basis in logic to assume that postemergency income of over 125% of the poverty line demonstrates an ability to plan prior to the emergency or to relocate during the period of the emergency. Since EHR was created totally by regulation, it was clearly within the power of the regulatory agency to either establish separate regulations for determining income eligibility suited to the individual program or to implement and interpret its regulations in a manner reasonably designed to fulfill their underlying purposes and goals.

It should be noted that, even applying such an interpretation, reference to current income would still be relevant on an application for EHR with respect to the issues covered in paragraph (5), which include the applicant's ability to pay for ongoing future shelter expenses.

Accordingly, we find that the interpretation given by the agency to the regulation's income requirement, in the manner in which it determines an applicant's eligibility for emergency assistance in paying rent arrears, is fundamentally irrational, and that the within determinations, based on that interpretation, were properly set aside. We therefore affirm that portion of the Supreme Court's order which remanded the matters to the agency to either issue the EHR grants or, if eligibility issues remain, to provide plaintiffs and plaintiffs-intervenors with an opportunity to establish eligibility. Eligibility should

be determined on the basis of gross income which is reasonably computed to include the time during which the applicant should have been planning for the emergency and the period during which the emergency situation which resulted in the arrears endured.

We note that with respect to others who are similarly situated as plaintiffs, the relief granted herein will adequately flow to protect them through the principles of stare decisis (see, Matter of Martin v Lavine, 39 NY2d 72, 75), and such individuals may reapply for EHR if it has already been denied based on the improper regulatory interpretation.

We have considered the parties' remaining contentions and find that they are without merit.

Accordingly, the corrected order of the Supreme Court, New York County (Helen Freedman, J.), entered February 8, 1993 which, inter alia, denied defendants' cross motion seeking to dismiss plaintiffs' complaint; declared invalid, pursuant to CPLR 3001, the amendment to 18 NYCRR 370.3 (b) (2) which disqualified from eligibility for Emergency Home Relief assistance those households with a gross income in excess of 125% of the Federal poverty guidelines; permanently enjoined defendant from enforcing the invalidated amendment; set aside prior administrative decisions for named plaintiffs and plaintiffs-intervenors and provided requirements for change orders; without formally entering an order certifying a class, established requirements for defendant to identify New York City applicants for Emergency Home Relief assistance whose applications were denied based, in whole or in part, upon enforcement of the subject amendment and provided for procedures and directions from defendant to the Human Resources Administration to reopen such applications; and directed that notice be given to the public, is unanimously modified, on the law, to reverse the order insofar as it declared the subject amendment invalid, permanently enjoined defendant from enforcing the amendment, extended relief to persons other than the named plaintiffs and plaintiffs-intervenors and required public notice, and to declare that the amendment, as written, is not invalid but has been applied to plaintiffs and plaintiffs-intervenors in a manner which is arbitrary and capricious, to delete from paragraph 10 (a) (iii) the phrase "without regard to the Amendment and without regard to any regulatory amendment which became effective after the date of application," and to provide that the eligibility determina-

tion provided for in said paragraph be made in accordance with this decision and is otherwise affirmed, without costs.

The appeal from the order of the same court and Justice, entered October 20, 1992, is dismissed as superceded by the order entered February 8, 1993, without costs.

CARRO, J. P., WALLACH, ROSS and RUBIN, JJ., concur.

Corrected order, Supreme Court, New York County, entered February 8, 1993, unanimously modified, on the law, to reverse the order insofar as it declared the subject amendment invalid, permanently enjoined defendant from enforcing the amendment, extended relief to persons other than the named plaintiffs and plaintiffs-intervenors and required public notice, and to declare that the amendment, as written, is not invalid but has been applied to plaintiffs and plaintiffs-intervenors in a manner which is arbitrary and capricious, to delete from paragraph 10 (a) (iii) the phrase "without regard to the Amendment and without regard to any regulatory amendment which became effective after the date of application," and to provide that the eligibility determination provided for in said paragraph be made in accordance with this decision and is otherwise affirmed, without costs. The appeal from the order of the same court and Justice, entered October 20, 1992, is dismissed as superceded by the order entered February 8, 1993, without costs.